Here the next case in re Express Scripts Holdings. Good morning. May it please the court. Salvatore Graziano for Plaintiff T. I. A. Your Honor, plaintiff's complaints in this action contain an extraordinary amount of detail that reveal the true behind-the-scenes disputes between Express Scripts and its largest, most important client, Anthem. Contrary to Express Scripts' repeated public statements to investors in this 10B securities fraud case, these companies were locked in a massive $15 billion dispute. They were not engaging in discussions at all. Before you proceed, could I interrupt for a second? You've characterized this as a $15 billion dispute, but I had difficulty placing that in the context of what's a huge contract over time. Can you describe what the deal was worth on an annual basis over the 10-year course of the contract? I think the best way to look at the magnitude of the deal is to look at Express Scripts' admission at the end of the class period, that if they would have given Anthem the $3 billion per year discount that Anthem was seeking, they would have been losing money on this contract. Can you please give me an idea of the amount of money that each year was worth? I don't have that committed to memory, but it's in the complaint, and what I'm saying to the Court is that Express Scripts wasn't even earning $3 billion in profit per year. You can't answer my question, is that right? I can try to find it in the pleading, absolutely. There were figures about revenues plus profits related to it, and a $15 billion swing is a large number period, but context is helpful. Sure, and in terms of context, this was the largest customer of Express Scripts. It represented as much as one-third of their profits. So if we take the Anthem request and we eliminate the profit on the contract, we get the company losing. So in terms of the Anthem-related revenues, in 2013 through 2016, we're talking between $12 and $17 billion of revenues per year from Anthem on this contract to Express Scripts. So $3 billion off of $12 billion is a material number. But the materiality, I think, has to be tied to the profits, because the profits here were one-third of EBITDA for Express Scripts per year on this contract. So this was a very, very significant event. There's another way we know the significance of this event, because when Anthem went public with its $3 billion per year request, that revealed something to Wall Street that Wall Street didn't know, and the stock price reflects that as well. Maybe you could turn to a different question, which is I had difficulty understanding. This read to me more like a 1933 Act and a 1934 Act complaint, because you point to different allegations. You make different allegations about false statements that were false at different points along in the class period. But it wasn't clear to me what rule you were espousing, at what point this became a fraudulent scheme with Scienter and with loss causation and so on. It was just kind of a floating. These false statements were made about how negotiations were going and how strong the relationship was between Anthem and Express Scripts. So at what point was there an affirmative obligation to disclose? Are you saying more primarily that to the extent any public statements were made, they were on one or more occasions inaccurate, and therefore that reflected a 10b-5 violation? Yes. At all times, this was a 10b-5 violation. From the very first statements in the class period in February, there were statements made that were misleading, that omitted material facts. So let's take them one at a time, because I think it would be very helpful to answer your question. In February, Express Scripts came out and talked about how great the relationship was, how very, very solid it was. They hadn't been talking for four months by that time. Do they have an affirmative obligation to disclose the course of these complicated negotiations with a huge client? I mean, that seems contrary to the interest of investors. You don't want to skew the actual negotiations. They absolutely could have declined to comment, but that's not what they did. They made selective comments, making it seem as if everything was going well in this negotiation. They called the negotiation productive. They called it current. By the time of the first statement, they hadn't been speaking for four months. By the time of the second statement, they hadn't been speaking for six months. By the time of December, when they said they were excited to keep going with the current productive negotiations, they hadn't been speaking for over a year. So this was a very hostile, locked dispute. What benefit would there have been to investors over the whole class period for them to announce that they were having unproductive negotiations with Anthem? Okay, so Wall Street was very specifically focused on this contract, and it was trying to project if the contract was going to be renewed beyond the 10-year term. So there were analysts that were making specific earnings estimates, especially because this is one-third of the profits of the company. How much is this contract going to be worth to Express Scripts after the end of the first term? So the investors were very focused on how things were going. They would ring up Anthem every quarter. They would say, how are your relations going with Anthem, your most important client? I'm sure it's great. And instead of being honest or refusing to answer, Express Scripts actually played along and created this false situation. With respect to the first pricing negotiation, it was a difficult negotiation, but in the end they worked out something. These allegedly false statements of things are great, very, very solid. Why aren't those statements of puffery or wishful thinking and the kinds of statements that we've held do not support a securities fraud claim? To say negotiations are productive when they're nonexistent really should not be dismissed away as puffery. To allow accounting for a contract that has an assumed five-year term built into it beyond the ten-year contract is misleading, and it's a violation of both GAAP and the securities laws. You've got a period of time to negotiate this, and there were also statements along the way that, in essence, saying we can't guarantee that we will resolve this, but we are trying. Well, if they would have said we are trying, that would be one thing. But what they said is we are engaged in good-faith, productive negotiations. We have a great relationship with Anthem. Our relationship is very, very solid. It is business as usual. So, Your Honor, respectfully, if they would have said we're trying and we don't know and we're going to account for this contract during its ten-year term, I would agree with you. Instead, they accounted for this contract not for the ten-year term, but as if it would be renewed for another five years, and they did everything to create the appearance to investors. And we see this because when they speak, the complaint is replete with analysts picking up on what they're saying and using it for their forecasting. This is one-third of their profits. Did PwC ever issue a qualified opinion? PwC issued an annual opinion, but there is no evidence at this point in the case that PwC knew what was going on in this bitter negotiation. There's absolutely no evidence that the back-and-forth where these parties are refusing to speak to each other was made aware. Didn't it have to sign off on its conformance to GAAP, on the financial statement's conformance to GAAP? Yes, but that doesn't mean they were privy. And didn't that include the reasonable probability about the 15-year duration and value of the contract? The SEC asked about the 15-year contract at the very inception. They told the SEC it's based on a high probability that the contract would be renewed for at least five more years. We have no reason at this point. Did GAAP require a high probability? GAAP required at least a probability likelihood that it would – GAAP required each quarter for them to reassess the situation. But GAAP didn't require a high probability, did it? No. What their investors understood from their statements to the SEC that were public is they were basing it on a high probability. They said this was the most probable outcome. GAAP required that this be assessed for the most likely outcome each quarter. And there is – it is inconceivable that by the December of 2015, when they have not even negotiated for over a year since the demand was made in October of 2014, that they continue to account for this as if it was likely going to be extended. We're talking – they can't even agree on the pricing in the original contract, but they're accounting for it as if it's been renewed for another five years. The reaction of Wall Street is quite revealing in this situation. When Anthem goes public – and not Express Scripts, by the way – and talks about the nature of this dispute, there are four days of statistically significant declines in the face of quite a shock by Wall Street as to what's happening here. When the complaint goes public, we have the back-and-forth detail of what was happening, and that, again, leads to a statistically significant reaction. Thank you. Thank you. Thank you. Good morning. May it please the Court. Scott Mussoff from Skadden Arps on behalf of the Appellee Defendants. Just to answer your question, Judge Carney, about the revenue, between 2012 and 2016, it ranged from about $13 billion per year in revenue to $17 billion a year in revenue. And with EBITDA going above a billion in some places and several billion to hundreds of millions of dollars in earnings, it's a complicated structure in terms of how you calculate revenue and earnings, but we are talking about that size of a magnitude. I also think, Judge Carney, your point about it seeming like a 33-Act case because the briefing in the complaint starts with some duty to disclose. And then when we discuss, and as we noted in our 28-J letter yesterday, that the courts within this circuit and the affirmance last week of Judge Sullivan's decision in Federal Gas says there is no duty to disclose the status of ongoing negotiations. In fact, the case they primarily rely on, Judge McMahon's decision in High Crush, she herself dismisses the earlier Section 11 claims there because even though there were bullish statements about the relationship, that the customer relationship was strained, that they were accused of breaches there, she dismisses those saying there's no duty to disclose breaches unless the relationship itself is at risk. So let's break down the class period. Let's go back to the very beginning. My friend says let's look at the February 2015 statements. Well, what does Mr. Queller, a senior vice president of sales, in an oral statement at an investor day, this is how they begin their class period, not with a statement in one of the SEC filings, but an oral statement made at investor day where Mr. Queller says, I know ANTHA made mention about contract negotiation. We're not going to talk about that. I don't think it's appropriate to talk in public about the negotiations. But he says the relationship is very, very solid. We're helping them roll out new states with Amerigroup, and it's business as usual. We're working with them very, very closely. If you could skip forward, actually. You know, accepting your position that there was no duty to disclose, nonetheless, representatives of Express Scripts went forward and described the course of negotiations. And December 22nd of 2015 in particular, there were representations made that this was very early on, and they were continuing productive discussions, whereas, in fact, they've been stonewalling since March. Why isn't that an actionable misstatement? Judge Carney, first, and if we go back to Mr. Paz's remarks where they say we're currently in discussions, he says we're currently in discussions with ANTHEM regarding the periodic pricing provisions. That's at A-412. ANTHEM itself, in January of 2016, after these statements, and this is on pages A-568-69 and A-553, the General Counsel of ANTHEM tells its shareholders we remain in dialogue. And then again on January 27th, 2016, the CEO of ANTHEM says the dialogue will continue, and we're hopeful that still in 2016 we will reach a resolution to this matter that we are engaged with ESI. That's ANTHEM. But I thought the record showed that ANTHEM had been reaching out to Express and getting no response in January of 2016. Is that wrong? With all due respect, Your Honor, I think those are pejorative characterizations of a negotiation that doesn't go well. Plaintiff's complaint says Express trips didn't engage. There were multiple meetings. They're claiming they didn't engage because they didn't accept the $3 billion demand being made on them when ANTHEM throughout the entire class period is telling their shareholders we're only looking to get about $500 to $700 million a year in savings, which would have potentially gotten a deal done. In their negotiations, they're starting with $3 billion. But to sit here and say there was no engagement is not true. In fact, throughout 2015, ANTHEM themselves on page 489 says they're optimistic they're going to get something done. On 5-15, we remain on track, A-5-15. That's July 2015. In September of 2015, ANTHEM at A-5-32 says we're hoping to finalize negotiations and conclude in a way that captures we've made this public something in the order of $500 to $700 million a year. So throughout this class period, ANTHEM is saying that. But what is the statements, again, that Mr. Paz makes? We're currently in discussions consistent with what ANTHEM is telling its shareholders. We're excited to continue productive discussions with ANTHEM. But then he says, based on the range of variables that could influence our discussions with ANTHEM, we are unable to provide a timetable or the likely financial terms of a successful negotiation. And then the early-on statement is Mr. Wentworth, CEO, in a Q&A, again, in an oral response to a question, when asked whether ANTHEM was reflected in the 2016 guidance, he says it was not included in the guidance because we're very early on in the process and we're working our way through it. So there's just too many variables at this juncture. Weren't they already a year into it? Yeah, but they don't know where it's going to end up. That's the point. So they're telling their investors, we don't know. There are so many variables that go into this. We can't estimate any of the financial impact. And by the way — In February, the relationship was not very, very solid, was it? In February of 2015, the very, very solid comment was made a year before the impasse. And what they're talking about in the very, very solid, he specifically says, I'm not talking about the negotiations, I'm talking about 2015 on A221, 175 million claims a year they're processing, 130,000 fully insured groups. I believe the revenue we discussed for 2015 was $16.6 billion a year. They're saying we're working closely with this company, and just like in federal gas, it was an important enough relationship that they were confident that they would try and reach a resolution. And again, this is a year before the end of the impasse. And I think plaintiffs do a lot of that. They take events from the end and then use the statements that were made at the beginning. Because what's made a year later in February of 2016, and this may be one of the most egregious examples of taking a statement out of context, there's a risk factor contained in express scripts 2015-10-K that's issued on February 16, 2016. This is following a few weeks after Anthem saying the dialogue's continuing. What's the risk factor? While we are actively engaged in good faith discussions with Anthem and intend to comply with the requirements of the agreement, Anthem has made public statements threatening litigation. At this time, we are unable to provide a timetable or an estimate as to the potential outcome of these events, any of which could result in a material adverse effect on our business and our result of operations. So what do plaintiffs say? They say in February of 2016, you told the public you were actively engaged in good faith discussions, and that's false and misleading. But when you read the statement, they say, well, we're engaged in these discussions. They have a meeting set up in a few weeks. They had a mediation in November. They say, well, we're still engaged in these discussions. They're threatening us with litigation. Any of these outcomes could have a material adverse effect. This is the opposite. What are we to make, though, of the fact that Anthem had already served express with notice of operational breaches? At least once. I think that goes back to the discussion of the decisions, including from last week, the affirmance of feral gas that distinguish high crush from this situation. Notices of operational breaches do not need to be disclosed. It happens all the time, recognized in business. Judge Pauley in the river-bent birch case, if there's not imminent litigation, if it's not relationship. And even Judge McMahon's decision in high crush says the same thing. These types of operational breaches go back and forth throughout. But you're talking about over a year before they even threatened litigation. So, again, the operational breaches, we would argue there's nothing in the complaint to allege the magnitude of them, nothing to allege that they couldn't have been cured. Instead, they take Anthem's post-class period, end-of-class period complaint with all of its unadjudicated allegations and try and bring them forward a year and a half. These notices trigger a further negotiation process. Is that right? Yes. Yes, Judge Ginn. The pricing mechanism, all it requires is a periodic period where you're supposed to sit down, no obligation, but to sit down in good faith and try and negotiate repricing. Your friend also points out or makes the argument that the fact that Mr. Paz described the $15 billion concession as ludicrous, and yet that was Anthem's continued position over the course of more than a year, also makes it misleading to have described the negotiations when speaking up about them as ongoing, productive, and in good faith. There had been no movement. Judge Carney, Anthem is publicly saying what they're looking for is $500 to $700 million a year. That's what they're telling their public shareholders in their SEC filings and otherwise. The fact that in a contract negotiation they're starting at $15 billion is not only ludicrous, but it doesn't suggest that with these multiple meetings that they may not be productive. With all due respect to my friend, I've been in many mediations with his firm where their numbers start off quite ludicrous and we end up with the resolution. So it doesn't necessarily mean – I'm sorry, may I finish the answer? Yes. So I think that's important. And then I would just conclude with the gap violation. These are very subjective gap requirements. They themselves are subject to Sanofi, where Judge Carney and Judge Parker wrote that opinion, and fate and all sorts of things. And, again, on page – and I'll conclude with this – on page A755 to 756, what plaintiffs leave out of the original SEC letter, even though that's well before the class period, is even there, Anthem says, we do not know with certainty that this contract will be renewed, or if renewed, what the exact length of the new contract will be. And, therefore, they use a probability-adjusted measurement. They never say there's a high probability it's going to be five years. With that, we'll rest on our papers for the remainder. Thank you. Thank you, Judge. We'll hear the rebuttal. Yes. Thank you. The district court summary of the facts in this case was actually quite accurate in terms of summarizing what was in the complaint. But then the district court shifted from the facts at issue here, the very specific facts, to a more general question as to when do you have to disclose the dispute with the customer. I urge this court, take the facts as true. They're well sourced. They're a source to both Anthem's complaint, but as well as Express Script's answer and counterclaim. Compare those facts to what Express Script was telling its investors. Therein lies the fraud in this case. Four months had gone by before the first class period statement when Express Script called the relationship great, very, very solid. They had not been negotiating. And what do you point to in your allegations to suggest that the people making those statements didn't actually believe them? Or weren't actually optimistic about concluding a favorable agreement with Anthem? Sure. Well, first of all, they could have been optimistic about concluding a favorable agreement. Fine. But they could not be allowed to deceive investors as to what was going on at the time. That is my point. What are the facts that they knew? They were directly copied in correspondence. Even the district court agreed it was a core, important contract to the company. They were all aware of it. They were negotiating. Their names were in the e-mails. They were at the meetings. Anthem said to Express Script, as late as December 2nd, you haven't even made a single counter to us. You haven't even responded to our demand going back to October of 2014. What about the disclosures that counsel just referred to where the company said we don't know if there will be a contract? We're unable to predict. Don't those statements take away a lot of what you're arguing? Right. I don't think they do for two separate reasons. So first, imagine a scenario where a company says we don't know what's going to happen, but we're negotiating, and, in fact, they were not negotiating. That's what this case is about. They were not talking to each other at all. What about the statements from Anthem saying we are negotiating?  If you look at Anthem's ---- It's one of the problems with trying to conduct a negotiation through public statements when you're doing it for certain reasons, both sides. But there are multiple indications from Anthem publicly that it is negotiating. That is not true, Your Honor. Anthem says we have been trying to get them to engage for a long time. We have been unable to. The general counsel of Anthem says what do I do? They won't respond to my demand. I guess I'll go to litigation. And he says that in January of 2016. Anthem is not saying that they're negotiating or they're successfully negotiating. If Anthem was telling its investors it was looking for less, $500 million to $700 million a year, there is no evidence that Express Scripts used that information with Anthem to say, okay, will you take the $500 million or $700 million a year instead of $3 billion? There is no evidence of that in the record. Moreover, I want to make this second point, which is Express Scripts' counterclaim says that Anthem behaved in bad faith. Anthem rejected five offers. Is it true that Anthem told its shareholders that $500 million would do it? Yes. But there is no evidence that Express Scripts seized on that to negotiate. They were not negotiating. Both Express Scripts and Anthem agree there was no negotiation over that number. But the second point I wanted to make in response to Your Honor's question is the accounting here also required them to take a look at the accounting each quarter. They were accounting for this contract not based on its 10-year term, but they were spreading out the costs over a 15-year term. There was no valid basis for them to do that under GAAP unless there was a likelihood of an extension. They couldn't agree on prices on contract number one, but they were accounting as if there was going to be a contract number two. And that was false and misleading, and it was clearly what Wall Street was taking into account when they were looking at this company. Thank you. Thank you.